Our last case of the morning, Halmedica Osteonics v. Zimmer, Inc., numbers 11-2342 and 11-2343. Mr. Kenworthy, Mr. Elvin, and Mr. Wexler. Good morning, your honors. My name is Tom Kenworthy, and I represent Zimmer, Inc., Zimmer Spine, Inc., Zimmer U.S. Inc., Paul Gravelin, and Chris Giebelhaus. They are the appellants in 2342. I've been allotted 10 minutes, and with the court's permission, I'd like to reserve two of those minutes for rebuttal. That's fine. The way we're going, we probably won't. We use that as sort of a very rough guideline. Understood, and I will address as many issues as I can in the court's questions and otherwise leave to my brief. The first issue I'd like to address is one that covers the injunction in its entirety, and that's the failure of the district court to require a bond. Rule 65C mandates a bond before a preliminary injunction can issue. You're basically suggesting that we should follow what the Seventh Circuit did in its case? Well, the Seventh Circuit or generally, the issue here, because if we even get to the question... Should revisit the 800,000. If we revisit, the 800,000 really was a TRO bond. That was issued to and was part of the TRO. How was that calculated? It dealt with a duration of a TRO, right? It was, Your Honor, and we'd actually asked for more, but it was to focus on what the damages would be. At that stage, it was envisioning the potential that it would be up to five weeks. Of course, this preliminary injunction is potentially a lot longer. It's for... Until April, right? Well, that's just for Paragraph A. All the others are totally without time. And if we're dealing with the issue of the amount of the bond as to whether she did any bond at all, the evidence here is undisputed. They got the injunction claiming they would lose a million dollars because we would take it away if we weren't enjoined. So necessarily, they conceded that without the injunction, we were going to get monies. They put in evidence what the projected additional revenues would be in both Arizona and Nevada of three million dollars a year. And when we look at the analysis of the preliminary injunction bond, excuse me, the temporary restraining order for a limited period of time and extrapolate that even for just a year, it would require that it be at least six million. And the serious problem with this issue is it's not just a function of securing an amount that we can look to if we're found to be unlawfully enjoined. It delimited. So this has serious due process ramifications that a party is precluded from getting any more. Should we fix the bond or just send it back and have the district court do that? Your Honor, I think it would be obliged because we really weren't even allowed to argue. When there was no bond granted, I was even allowed to put in all the evidence. Judge says, Mr. Kenworthy, I don't want to talk about that now. So I don't think there's a complete record on the amount of bond at all because... Well, that sounds like a remand then. Yeah, so I think on that issue, it would be to remand. And we have other issues, obviously, that we have concerns about substantively that go beyond that. The first of those is with respect to Messrs. Diebelhaus and Gravelin. Not one finding of fact whatsoever as to either of them. They weren't mentioned until someone asked, what about them? Exactly. It was I who asked that. The argument being that it was an afterthought. And at that stage, she still didn't make findings of fact, but her basic theory was, well, I'm going to enjoin them. You too. You too. Let's not unhitch the wagon. And if, although there wasn't any evidence now, if after discovery you show there isn't any evidence, you can come back to me and we'll re-entertain that. All right. What about Rowan and Poulomanis? Well, I'll let... There's a little bit mentioned. Yeah, I'll let Mr. Elvin, because they're his clients. But with respect to that issue, not only do we believe that's an untenable to issue an injunction without findings to which they're entitled and say, come back later. The reality is when we came back later, the court said, and this, the court can take notice of this, even though it's not on the record, because it came later, says, I'm not going to entertain the request, even though you've presented evidence showing they had no involvement, because you have a motion to dismiss, which has never been ruled on by these defendants as to whether there's a jurisdictionally sufficient amount, and you're going to be before the Third Circuit. So I'm not even going to hear you. So she denied our ability to even come before her. So as I understand that argument, you're saying that before the injunction could even be a determination that the district court had jurisdiction over these two? Yes. And there was no, the record is devoid of a jurisdictional rule? Devoid. And the problem is, is that these two individuals, to the extent they did anything, it related to arguably, looking at it at best, attempting to solicit somebody to come who didn't come at all in Chicago. So, and with Mr. Groveland, all it was was a chance comment when he was walking through the office. That was Groveland, but that wasn't Giebelhaus. That was Groveland. Giebelhaus, there is evidence that he did, if believed, violate his obligation not to solicit a colleague, but they didn't come. So there's no damage. And that's the essence of the motion to dismiss, is that there's not a jurisdictionally sufficient amount as to those defendants. The third substantive issue I'd like to address is paragraph F. Paragraph F related to the injunction against any solicitation of any employees, at-will employees, of Stryker. And it's too broad. Also, isn't E a subset of F? E is a subset of F, and we aren't specifically challenging E, because, other than the general, but it does have an improper. And there's no question that the solicitation of at-will employees is not inappropriate. Zim or ink, there's never been any evidence, no evidence of record. So with respect to paragraph F, I read your brief as saying you're not disputing any facts here, so it's really, our standard review is abuse of discretion as to this, right? Well, there are two. That's too broad. With respect to the facts, Judge Chigaris, there were no findings of fact. She didn't do any of the four-pronged analysis as to that relief. Her real four-pronged analysis all related to paragraph A, so there was no analysis. And with respect to facts, there was absolutely no facts to suggest that there was any intent to improperly solicit. There was no doubt the fact that there was the potential that we would be soliciting out at-will. We didn't dispute that that was something that we might do, because we're absolutely entitled to do it. It's like taking one of the players and saying, you can't participate in free agency. And they'll let everybody else out there participate in free agency, and you can't. And if you look at paragraph E, at least that one prohibits you doing it by using employees who have a contractual obligation. So it fits exactly what educational testing was of it being way broader than in any way necessary. But our standard of review would be abuse of discretion as to your argument, right? I think it's an abuse of discretion, but I think it's an error of law not to have made any findings or analysis under the four prongs with respect to that type of relief. Essentially, what happened is the entire order was adopting what was submitted the day they filed the lawsuit with some modifications to paragraph A and rearranging them. So it was just adopting it wholesale, and in many regards, there was never any analysis of any of the issues whatsoever. Well, we hear from Mr. Elvin, and Roberto, instead of five minutes, make it 10 for Mr. Elvin. Okay. And the other issues, we can either address in rebuttal, or I'll rely on my brief. May it please the Court, Michael Elvin for defendants Loughran, Lively, Hermansky, Hilton, Fallon, Bursiaga, Poulomanos, and Rowan. Yep. Eight individual defendants, we call them. Correct there. Tell me why you haven't waived your economic loss doctrine argument. Well, first, this Court has the discretion to consider issues of law not considered by the district court. Absolutely. But you've got to bring it up to the district court. No, even as the issue's not raised in the district court, this Court has discretion. It's supposed to be miscarriage of justice type. Correct. Yeah, I mean, something like really bad. Well, we would submit that this is. I mean, the Court basically made tort findings, did it not? It did. And you're, I mean, we'll get into in a moment whether the, there are district court decisions in the District of New Jersey that may go further than what the New Jersey state courts have done. But my first point is, you need to bring it up. I mean, the point being, Your Honor, this is a contract. We think that New Jersey law requires preemption of any tort claims when you have a contract. Similar to what you see, for example, just to give an example, in my own state, Delaware, when you have limited liability companies, the contract prevails. That's the default rather than the statute as you have, for example, with the corporations in the GCL, general corporation law. But I don't see anything where you've made that kind of argument to the district court. We absolutely argued, Mr. Kenworthy and I, that this fundamentally is a breach of contract case. Oh, I understand that. You said it's a breach of contract case. But where did you say that contract preempts tort? We did not say it in those words. Okay. And then so, and now why is this the, quote, extraordinary circumstance, close quote, or even more than that, that's necessary for us to consider it? Because this injunction can't stand analyzed under breach of contract. And my clients have been severely prejudiced by that. But you're able to go back to the district court now. You're still litigating it. Why can't you just raise it there? Interesting you ask that question, Judge. We tried in a motion to dismiss to raise it. And we tried in an amended motion to dismiss to raise it. And as recently as November 30th, those motions to dismiss were terminated by the magistrate judge. And now we have to raise the economic loss doctrine, I suppose, in a motion for summary judgment. So on May 25th, in a motion to dismiss, we raised the economic loss doctrine. So I would submit, Judge Ambrose, that we have raised it in the district court. Did we raise it before May 13th? No. Did we strenuously argue that this contra- I mean, this thing was hot and heavy back at the end of April, beginning of May, I guess it was, beginning of May. Correct. The, well, let's just take a look at what the New Jersey state courts have done. And then let's look at how federal courts have interpreted it. Yes, sir. And when we, when you look at Spring Motors, when you look at Alloway, it looks like what the New Jersey state courts are merely talking about is the economic loss doctrine being possibly applicable in products liability cases. Certainly in Spring Motors. And then it was later extended to non-commercial buyers in Alloway. Correct. So, okay, no Supreme Court decision of New Jersey. Then you look at what appears to be some conflicting district court opinions. You've got Trico, which seems to think, well, maybe it's conditional test whether the tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties. And then you've got another earlier case, which has, says that Spring Motors dealt only with tort. This is Emerson Radio. Right. Judge Wollen's case. Spring Motors dealt only with the tort theories of strict liability and negligence. Unfair competition, like fraud, is an intentional tort, and every person is under a duty not to commit intentional torts. So there's some tension. And then you've got our case in Gleason from 2001, in which we said the New Jersey district courts still hold that tort claims not extrinsic to underlying contract claims are not maintainable as separate causes of action. New Jersey state courts have not agreed with the district court's interpretation of Spring Motors. The New Jersey Supreme Court still has not decided the issue. We will avoid predicting New Jersey law by deciding the tort issue on its merits. Sounds like Gleason is what we ought to follow. I would submit you should follow Warwinski. In Warwinski, this court did predict what Pennsylvania law would be in the economic loss doctrine. So there's a tension there between Warwinski, where this court was willing to wade into the muddled waters, and Gleason and Vanguard. But was there more definitive analysis done by Pennsylvania courts than there was by New Jersey state courts that confine it to a small niche so far? Perhaps. But I don't believe Pennsylvania law was any more clear than what New Jersey law is. And I also believe that all of the district court decisions can be harmonized if one looks to whether the torts were extrinsic to the contract or not. And I have a chart here anticipating precisely this question. And I believe that when you look for that concept, was the tort extrinsic or not, that all of the district of New Jersey cases, with the possible exception of the CAM decision, can fall into that rubric. And here we lay out in our brief why the tort claims against my clients are embedded squarely within the contract. This case falls on all fours with Trico, too, which we would submit as the correct analysis. All of the tort claims are based on the same conduct that's alleged to be a breach of contract. But isn't Trico sorted by its lonesome, based on what I read to you so far? No. Okay. Well, it's in tension with Judge Wolin's opinion. What other cases, what cases of either district courts or our court, excluding our court perhaps dealing with PA law, would support the Trico reading of what the prediction would be of New Jersey law? It depends, Your Honor, frankly, whether you're talking about interpretation and application or the analytic convention. Right? The analytic convention being, is it extrinsic to the contract or not? And a case that directly holds in the same fashion that Trico does, I do believe Trico is the only decision that analyzes and then holds. Well, Zimmer's conduct was clearly extrinsic to the contract. Zimmer's conduct is irrelevant, I would submit, Judge Hartman, with respect to my clients. Well, I'm not so sure, if the trial judge was correct, that what Zimmer did here was tortious and it needs to be enjoined from doing it, then your clients might not be eligible to work for Zimmer and pull the rug out from under Stryker's Las Vegas and Arizona operations. The injunction against my clients needs to stand on the claims against my clients. An injunction against eight individuals based on Zimmer's conduct. Well, Zimmer can be precluded from employing these folks. Can it not? Are you saying the district judge doesn't have the power to do that? District judge may have the power to do that. That was not asked for in this case. And to your client's benefit, that was not asked for. True, true. My point is, if the district court can go the whole enchilada, why can't it go halfway? I mean, that seems obvious, no? No, not lumping all parties in the same injunction. I think I'm with you on that. Rowan and Pulumanos, aren't they situated differently than your other six clients? Can you address that? I was very glad that you asked that question because there were no findings whatsoever about Rowan and Pulumanos. And the findings against the others, when you read them carefully as we did in our brief, what did it prove? That they talked to doctors and said they were leaving. That's it. Well, they had a little more than that. They had a flip-flop that wasn't a complete flip-flop because you've got someone visiting, I think it was Dr. Theodore, you know, winking a nod, hey, I'm not covering you anymore. Of course, my friend here is going to cover you and you'll be taken care of. I mean, that was a finding of the district court, was it not? That's true. I don't believe the finding was quite that strong with respect to Dr. Theodore. I think the picture was a bit more muddled with respect to Dr. Theodore. I think a tray was delivered, right? I mean, the district court found that a tray had been delivered. Well, where are we practically? I mean, the injunction, I guess, is almost over. We've got another, what, three months or four months? Paragraph A, right? Paragraph A, two months. Two months left. So, what have your clients been doing and what are they going to do when the two months are over? They've been servicing people who they're permitted to serve. And then when that's over, then what? We'll see. I think, I don't know what Zimmer's plans are with respect to my clients. That may depend on the final hearing on the merits in front of the district court, I suppose. It may. I think it would be premature for me to comment on what their business plans are when the injunction expires, assuming there's no petition made to extend the injunction, which is another possibility. This injunction was not tied as it needed to be to the contract language. With respect to my clients, it is far broader than that. So, you'd like a ruling on this by, at least by April 1st? Optimally, yes. Okay. Because if it's a tort claim, it can go beyond April 1st, right? In theory, yes. And that's the injustice that's been committed here against my clients, right? An injunction that's completely unhinged from the contract, that bars activities that we would vehemently argue are permitted by the contract. It's based on tort claims that we would submit are barred by the Economic Loss Doctrine. But the argument of Mr. Wexler would be that the decision of the court came down on May 13th. May 25th, you decide, hmm, let's see what else we can do. We're going to argue the Economic Loss Doctrine. Perhaps too late. You're relying on New Jersey law, one New Jersey district court case that may be helpful, and another case that appears not to be helpful, and a case from our court that says, you know, let's not really enter that thicket. And it's a pretty tough one to make. And you add the facts here. I mean, the facts here got this district judge pretty concerned that there was predatory activities taking place, at least with regard to the eight individual defendants. And, you know, maybe the other two were lumped in. But it looks, on the facts that she found, pretty significant in terms of the activities that were done here. It's a real strike at strikers, Arizona and Vegas operations. I would submit that a waiver argument is very hard to swallow here. When we raised the issue in a motion to dismiss, we tried to go back. When did you file the motion to dismiss? May 25th. Twelve days after the decision came down. Correct. We tried to go back, as Mr. Kenworthy said, to the district court and seek a modification of the injunction. We were rebuffed in that overture to the district court. Then the motions to dismiss are tabled, in effect. They weren't denied. They were simply, what's the word? I don't have it, but they were rendered moot, right? Terminated was the word. Terminated. I don't know what that means. So now we have to raise the issue in a motion for summary judgment, at which point the injunction likely, at least to paragraph A, will have been expired. So as we see it, we've been enjoined for 12 months and have had no adequate opportunity to fight as we should have been able to fight. Let me just ask you a question about the equities, since we are in equity here. Your clients that say the one year is, it's not extended beyond one year, provided that they work for someone other than Zimmer. Is that acceptable? My clients have no desire to work for anybody other than Zimmer. I'm not sure I follow the question. All right. So your clients are tied to Zimmer's, to Zimmer. My clients... If the district court determines at a final hearing on the merits that Zimmer can't be allowed to continue to compete or should continue to be enjoined from competing pursuant to Project Sun Devil and Project Viva, then your clients might be the collateral damage of such a decision then? Correct. Okay. Can I just ask one more question on choice of law? This may not be your argument, maybe Mr. Kenworthy's, but it appears that for the first time on appeal, people are starting to contest on your side of the courtroom that New Jersey law apply. Is that... It appears to be waived, but do you have a position on that? The only choice of law argument that we made was with respect to the economic loss doctrine. That's in a footnote of our opening brief. And as to that, because of the choice of law provision in the contracts, we argued that New Jersey law controlled the economic loss doctrine decision. The other choice of law argument that's been made in the briefing is, in fact, Mr. Kenworthy's and Zimmer's. Let's hear from Mr. Wexler then. Thank you. My name is Michael Wexler. I am here representing the appellees in this matter. Let's deal with the... Start with the two Zimmer defendants, we call them. I'm not pronouncing it, Graveline and Giebelhaus. What did the district court cite as the irreparable harms with regard to them? I don't know that the judge specifically used the words Graveline and Giebelhaus to cite irreparable injury with regard to those two individuals. But what was presented in the record, Your Honor, and I cite to the record to pages 62 to 63 of the preliminary injunction transcript, as well as 386 to 389 and 477 to 478, there was testimony and evidence that Mr. Graveline, for example, was a participant in email traffic regarding this scheme. Additionally, when Stryker representatives, Mr. Miller and Mr. Williams, went up to Zimmer to meet and interview with Zimmer, Mr. Graveline went and met with and asked, I believe it was Mr. Williams, if he would come over to Zimmer. That, of course... What was the... There were attempts made that turned out to be... to fail. No people came over. So there were no lost personnel, there were no lost sales. What were the irreparable harms with regard to these two individuals? Sure. With regard to Mr. Giebelhaus, and if you note the way he was enjoined, he was not prevented from continuing to sell the way he has been selling for Zimmer. So with regard to Mr. Giebelhaus, the testimony at the hearing was that Mr. Giebelhaus specifically asked Mr. Miller and Mr. Williams to come and join him at Zimmer. The testimony was that Mr. Giebelhaus admitted that he had met with his doctors ahead of time and asked them to join Zimmer, and that he told them that he would get other reps to cover them when he went over to Zimmer. That was all testified to. With regard to that then, the judge didn't find it as persuasive, I suppose, as other testimony, and did not prohibit Mr. Giebelhaus from soliciting customers. As you note... Are you really as concerned with these two folks as you are the other, the eight individual defendants? We are, Your Honor, because Mr. Giebelhaus admittedly, though unsuccessfully, tried to take customers with him and specifically tried to get Mr. Miller and Mr. Williams to leave. But what did their actions have to do with Arizona and Las Vegas? Because, Your Honor, we have found out in testimony that there was a plan by Zimmer to get as many as 29 representatives to join Zimmer in order to fulfill Zimmer's plan to grow their market share in the spine industry. Well, I appreciate you're scouring the record, and it's good lawyering, but the fact is we've got the district court findings, which are long. I mean, and what we're seeing, perhaps, is a lack of findings or balancing the things that would bind a person to an injunction done by the district court. Wouldn't it be appropriate to send it back? As to these two individuals. As to these two individuals, to send it back to make some findings? Of course, this panel is free to do that, but we believe, Your Honor, that the evidence at the preliminary injunction hearing and then in the findings of Mr. But what's not the evidence? It's read Rule 52. Right, Your Honor, in the findings. You know, if this were a jury trial, we would scour the record. We do that all the time to see if the evidence was sufficient to support it, and the judge does not need to make findings. Rule 52 requires specific. I think the word specific is used, isn't it? Yes, Your Honor, and I think. So where are the specific findings vis-a-vis Giebelhaus and Graveline? Well, with regard to Mr. Graveline, when Mr. Kenworthy pressed the court as to Mr. Graveline, the court specifically referenced the e-mails that Mr. Graveline was copied on, and that is in the transcript of her ruling. And then with regard to Mr. That's a specific finding of balancing the equities, irreparable harm, likelihood of success in the merits? I think what the judge did was the judge may have grouped the individuals together in their conduct. But clearly, when the judge said, for example, that paragraph A didn't apply to Mr. Giebelhaus, the judge clearly had delineated and made a factual finding that a paragraph of the injunction didn't apply to Mr. Giebelhaus. So clearly, she had contemplated the individuals and not just grouped them together and said this is going to affect everyone. Or she treated him differently without making a specific finding in derogation of Rule 52. That's certainly one way to look at it, Your Honor. What about Roan and Poulomanis? Your Honor, with regard to Mr. Roan and Mr. Poulomanis, there was testimony in the record. And again, I think the judge may have grouped together the individual defendants in describing the conduct. But in the actual transcript of pages 345, 359-360, 239-240, 242, 352-354, and also I believe 190-191, there's testimony with regard to conduct where the individuals had met together, had talked about this flip-flopping plan, had discussed going to their doctors ahead of time, and talking to these doctors about moving them over to Zimmer. Again, while there may not be the specific names of Roan and Poulomanis mentioned by the district court, there may be some, the judge I think grouped them together and looking at the totality of the evidence that was presented to her and talked about them as the individual defendants because the conduct was basically identical with all these folks with regard to meeting ahead of time, planning, participating in this scheme to move Stryker's entire business in Arizona and Las Vegas over to Zimmer. Could I add, unless you have something else, but is there a tort of corporate rating, a tort of corporate rating, is there one recognized in New Jersey? We believe there is, Your Honor, and that's why we cite to the case law found in the But isn't that really, I saw that, but doesn't that really go to elements of say tortious interference claims? There may be some similarities, Your Honor, but when the specific act of focusing on a number of individuals with the intent to improperly move them and, more as we noted in the United Aircraft case and the wherever case, Your Honor. Does it matter what we call it, tortious interference, unfair competition, corporate rating, is it all sort of semantics or? No, Your Honor, I think there's a slight distinction in the case law between what's required in tortious interference and what's described as corporate rating in these other cases. Am I correct in understanding that under New Jersey law, Zimmer was free to conclude that one particular salesperson in Arizona was, you know, the Albert Pujols of the Spine and, you know, offer them a handsome, that person a handsome contract. They could do that, right, as long as they didn't intend to decimate the business and as long as that Albert Pujols didn't violate his or her non-compete, then that's the way they should compete. That's your position? Today we say Prince Fielder. That's right. Am I correct, or do you take issue with anything I've said? No, I don't. Because I understand the gravamen of your claim. It's, look, what New Jersey law says is you can't do it wholesale with the, instead of just trying to pick and choose the stars that are going to help your business, you can't do it in a wholesale fashion with the intention of decimating the competition. Is that? That's correct and that's what the case law says, Your Honor, and I think to pick up on a point you mentioned earlier, the fact is, is that Zimmer hired Mr. Brofin. Mr. Brofin was given an unlimited budget to go and take every single representative from Arizona and Las Vegas and he admitted at the hearing and the district court found that he intended to, quote, cripple Stryker. That extringic tort, if you want to call it that, is really the gravamen of this case. And it's after that we get into these other issues about whether contracts are violated, but. Understood, but when you look at, for example, paragraph A, I can understand that it applies to former Stryker employees, but why should it apply to Zimmer salespeople who never worked at Stryker? Your Honor, what the court was trying to do, and she went to great lengths to describe this, is that she focused in on what was the peaceful time or what happened at the time prior to Zimmer improperly entering into this marketplace. And what the court did was the court tried to fashion relief that would put everyone back to where essentially they were on the morning of March 21st, 2011, which is where Stryker had a full sales force and Zimmer had a minuscule existence in these territories. And the court said it wasn't proper to wholesale, target all these folks, try to cripple your one to service its customers. How do I address that? And the court said, I'm addressing by entering this injunction so that Stryker could rebuild its sales force and repair its reputation and its goodwill, which was damaged by Zimmer taking every single employee. Isn't that the next case and not the one before you? The claim is that there was the taking or having Stryker, former Stryker people, aid Zimmer in the attempts to get doctors and sales that previously belonged to Stryker. But where is there that people who never worked at Stryker were actually part of this at Zimmer and they need to be enjoined? Because, Your Honor, what the court was focused in on was if Zimmer's scheme was to decimate the Stryker sales force, meaning there was no one or virtually no one, I think one employee was left at the time, that there was virtually no one to service the doctors. And you have to remember here that it's not an issue that these representatives simply sell product. These representatives actually go into the surgeries. No, I understand how it works. My son's a surgeon. So you know what happens, Your Honor. Then there's no one at Stryker to go into these surgeries and serve these physicians and assist in the surgery. So what happens is the court looked at that and said, well, how do I rectify that? Because otherwise, Zimmer is going to succeed in its scheme. Whether these individuals were then going to move these doctors over or by crippling Stryker by having no representatives, other Zimmer employees would do it. What impact does the fact that the district court make with regard to Paragraph A with respect to making the injunction as broad as we just talked about? Because the court went through and made numerous findings where the court specifically said that if the intent was to cripple Stryker. But the court centered on the threat of ex-Stryker salespeople going out to bring doctors over to Zimmer. But the court also focused in on Zimmer trying to enter the marketplace improperly. Why isn't that just fair competition, though? I mean, if Zimmer can get work in Phoenix and Vegas by posting on Monster.com or anywhere else and get people to serve as docs in those areas, that's fine, isn't it? Well, first of all, that's not what happened. But if it was simply an issue of posting a Monster.com ad and then people apply, that would be fine. The situation. Then the injunction's overbroad. I think what we're trying to probe you on is isn't there some... Let's assume for a minute that you're entitled to your injunction and we're just talking about what shape it needs to take. Isn't it overbroad in part? No, not at all, Your Honor. Because remember, on March 22nd, when Stryker is left with virtually no employees and no one to service its doctors, those doctors are going to go elsewhere. Whether it's one of the named individuals or it's another Zimmer employee that can walk in the door and service that doctor, then Zimmer is completing its scheme. It may not have these individual defendants walking into that surgery, but it's going to have its other employees walk in. By going out in the marketplace legitimately and hiring new people, it's still having an unfair competitive advantage because the vacuum left by the decimation of Stryker's would facilitate that. And the court specifically found, and Mr. Bortring Spatzel testified, that it takes four months, many months to four years, to train an employee to be able to walk into that surgery, to gain the doctor's trust, to know what to do. So you can't just advertise and get someone. Those people have to be trained. And the court focused in on that and made that finding because you needed... What the court said was Stryker needs time to put a sales force in place and to train people to cover this vacuum that Zimmer created. I mean, essentially, Zimmer... Do we have a crisis of care in these areas, then? I mean, Stryker's not servicing, Zimmer can't. I mean, who's taking care of the patients? First, Your Honor, Zimmer had virtually no business in these areas. As to Stryker, we were left in the position of trying to fly in employees from around the country and... You made clear that that's only working so well. It's not... Exactly, Your Honor. It's not perfect. Is there a crisis of care or not? I think crisis of care is a strong word. I think Stryker is disadvantaged in being able to supply the necessary personnel and products in those areas, but is doing the best it can and is rebuilding its sales force. Are there two other firms in the market or... Yes, Your Honor, there's other companies that also supply spine. And what we've seen is after March 21st, customers left in droves because of what Zimmer did because, as the testimony bared out, doctors didn't trust that Stryker would have the trained employees to cover these issues. If you could address two other issues before we have you sit down. Yes, Your Honor. The paragraph E and F, isn't E, doesn't that cover you? And they agree that it covers you. Why do you need F? I mean, that's extremely broad, much broader than E. Forbid Zimmer from approaching a single Stryker salesman that they'd like to hire. Philadelphia, for example, takes place a year after Project Sun Devil and Project Viva were put in place. I mean, that's quite a bit much, isn't it? No, Your Honor, as the evidence in this case is borne out, Zimmer hatched a plan that didn't just consist of Viva and Sun Devil. It was a plan across the country to actually try and gain 29 representatives any way they could to increase their market share. And because of this conduct that they engaged in, I think the court looked at this and said, we're not going to let Zimmer try to carry out this scheme. Just speaking for myself, F looks like it's piling on. I'm sorry, Your Honor. F looks like it's piling on. And you had a judge that was sympathetic to it, but I mean, it looks like it went quite far, further than E by obviously by the language, but also further than it needed to do. Under the circumstances. I think under the evidence presented that this was a greater scheme than just Arizona and Las Vegas. I think the court made a proper finding, actually. May I briefly address the economic loss doctrine and the bond, Your Honor? Let's do the bond. The economic loss doctrine, I think we've got that in hand. Okay, Your Honor. With regard to the bond, it is incorrect to say that the judge said that the bond was for five months, I think is what was alluded to. Let's just say Zimmer was wrongfully enjoined. Why is the current $800,000 bond sufficient to cover its damages? It's sufficient, Your Honor, because over the period of the year that Zimmer may have been enjoined, they would have potentially realized amounts even less, net profits less than $800,000. $800,000 is actually more than that. Or potentially realized profits much greater than $800,000. I mean, their point is they weren't even given the chance to make that argument. I mean, Judge Hayden just said, I'm just continuing it and that's it. And is that really what the law compels? That's actually incorrect. They chose what they wanted to put on as evidence at the PI hearing. They didn't put on any evidence as to what the appropriate bond should be. And when we got to the findings of the court, they then asked about the bond. And number one, the court specifically found that the bond was not for five months. It was not for a set period of time. It's right in the judge's findings at page 44, lines 4 through 25. The judge clearly said and agreed with the argument that the $800,000 was never set as being a five-month bond. Second, there was no evidence presented by the defense whatsoever as to what an appropriate bond would be. They had perfect control over what they presented at the preliminary injunction hearing. And more importantly, they filed an opposition brief as well. And again, they didn't present evidence or argue that the bond should be more than $800,000. Their point is they weren't allowed to come up to the plate to do that. They were at the hearing, Your Honor. Remember, the hearing was earlier in the week, Monday and Tuesday. The judge then made her findings on, I believe, Friday, May 13th. So at the hearing itself on Monday and Tuesday, they didn't put on a witness. They didn't put in testimony regarding the bond at all. And now they complain about something that they actually didn't address with regard to the hearing itself. Typically, that's done after you lose on the merits of the injunction. I mean, you have a separate bond here. I mean, why waste the court's time talking about a bond that might not even be necessary? I mean, deal with it when you have to. Let me give you one minute on the economic loss doctrine. I cut you off. But why don't you tell us what your thoughts were on that? First, Your Honor, the economic loss doctrine was waived in the trial court. I think that is crystal clear. It was never brought up. Second, Your Honor, it has... He said he brought it up on May 25th. And it's in connection, even though it's after the P.I., it's well before the hearing on the merits. Sure. Number one, economic loss doctrine is only applicable to product liability cases and possibly a business transaction. That's, even reading the case almost favorably to the defendants, it's not applicable to this situation. But more importantly, it's a damages concept. It has absolutely nothing to do with a preliminary injunction. And in the one case, a district court in New Jersey, in the one case where it came up, the court granted summary judgment on breach of contract in favor of the plaintiff and then went through the other counts of the complaint looking at damages and then dismissed those counts because they said that the acts were interrelated and so the court wasn't going to award damages. It has nothing to do with preliminary injunction, whether you grant it or not. It's also not a bar to bringing a claim. It's not a bar to presenting evidence at trial on a claim. And it's not something you can bring up in a motion to dismiss candidly and ask the court to dismiss it before liability has been found for breach of contract. It just has no place here. It's a red herring, to be honest. Thank you very much. Thank you. Mr. Kenworthy, I think you're the only one that has rebuttal time. A couple of points. First, with respect to mining of evidence, this isn't mining evidence. None of that talk about the 29, that's all evidence that's happened in discovery. It's not in the preliminary injunction record. So none of that is before the court and she didn't base her finding on any of that. With respect to this issue of Mr. Gravelin being copied on emails, now he's somehow a tortfeasor. All of it was copied on emails, and it was testified to, is because he was in charge of supply. And if we're getting new people who are going to be starting on April 1st or April 4th in Las Vegas and Arizona, we need to have supplies there. That's what he was involved with. And these emails do not involve him in agreeing to anything whatsoever. With respect to the evidence of the amount of the bond, we most assuredly put in evidence. We put in through both their witnesses and Mr. Brodin what the amount of anticipated profits were going to be. It's in the record, and it's over $300,000 and over $3 million per location. All of that evidence of how we would be harmed, if enjoined, was absolutely in the record. And we tried to argue what was in the record on the 13th, and she cut us off. With respect to the duration of the only bond... This is the day she actually entered the... That's the day she entered. The opinion on... With respect to the duration of the bond, that bond is a temporary restraining order bond. The only thing it does is protect us if we are found to be improperly enjoined by the TRO. Obviously, that was only for five weeks. That's the only bond the court ever entered. And with respect to the issue of the scope of paragraph F, one of the things that is completely ignored throughout here by Stryker is that the purpose of a preliminary injunction is not to be punitive. If there are damages that flow from this, that is down at the end. It's to prevent future unlawful conduct. And that's not what this does at all. It doesn't even purport to be geared toward... You're talking about paragraph F now. Yes, or it's across the board, to be honest with you, Your Honor. That's the same problem with paragraph A. And one of the problems with paragraph A is the four criteria. And just very briefly, the damage to Stryker that they claim is all compensable in monetary damages. They talk generally about loss, but there's no specifics. This court has held the lack of specifics isn't sufficient. And there's no way this claimed loss of goodwill is remedied by the injunction. That's what the injunction has to do. If it's not going to remedy it, it's what irreparable harm they will suffer if not enjoined. This injunction doesn't help any of what they claim generally to be irreparable harm. With respect to the balance of harm, however, Zimmer, not only because of the bond problem, but because they are expanding, and the suggestion that they didn't have any business there before. The record also shows that in Arizona, the year before this, they had $2.5 million of business. So they were only doubling their business. And they had a half a million dollars of business in Las Vegas. So this thesis that they had no business is not accurate. It's not supported by the record. But they were adding to their business, and a lot of this business would be new. And whereas Stryker probably can recover their damages if they're found to be liable. Zimmer, on the other hand, because it's new business, is going to have a much more difficult time totally aside from the bond. And finally, the public interest factor clearly weighs against the injunction. Because this precludes doctors, who may not have had any involvement with Stryker for years in the past, from themselves, unsolicited, coming to try and purchase Zimmer products. They can still purchase Zimmer products. Not from Zimmer. Because they're going to be held to be involved with, by the broad language of this, that we would be, if we accept it. Where does it say that? Let's just say Dr. Lee. Let's just say he changes his mind. And he now realizes, based on an article or a colleague, you know what, I kind of like Zimmer products. Why couldn't he pick up the phone, call, and say, I'd like to try it? Because they're going to then say, we are involved in moving this business. No, they're going to say that. They'll be wrong. Aren't we moving the business? That's, again, it's an indefinite problem. But by their definition of what moving the business is, if we accept, if they say he's presently a, or because the judge. It's his defendants in all parties in active concert or participation with them. Under Judge Ambrose's hypothetical, Dr. Lee's not acting in concert with anyone. He's a sole doctor sitting there, picking up the phone, making a phone call. I would hope that would be the case. But I clearly hear the argue. And it says. Oh, they may sue. No, but he calls us. He's acting in concert with us now when we accept his business. And they contend, because they've made that argument throughout the trial, that that is moving the business. We weren't limited to soliciting. And the definition of current customer was such that it's anybody. And that's part of the problem with the indefiniteness of the lack of specificity on what is moving the business. Thank you. Thank you to all counsel for well-presented arguments. Would ask that a transcript be prepared to this whole argument to be split evenly between Stryker and Zimmer. Fair play, your honor. Thank you.